**Shari Lou LUEDKE, Appellant (Plaintiff Below),**

v.

**Robert Emil LUEDKE, Appellee (Defendant Below).**

No. 4-383A76.

Court of Appeals of Indiana, Fourth District.

April 1, 1985.

John C. Vandivier, Jr., Raber & Vandivier, Danville, for appellant.

F. Robert Lively, Indianapolis, for appellee.

MILLER, Presiding Judge.

Shari Lou Luedke brings this appeal, involving the division of marital property, from the trial court's amended decree of dissolution, which ended her nineteen-year marriage to Robert Emil Luedke. Throughout the marriage, Shari was engaged solely as homemaker and mother to the couple's three children, while Robert performed the role of breadwinner for the family. Thus, virtually all the parties' marital property was acquired with funds earned by Robert in his employment. At the time the marriage was dissolved, Robert's economic circumstances and earning abilities were far superior to Shari's: Robert held a secure, high-paying (about $100,-000 per year) executive position while Shari had been unemployed and without income for nineteen years as a result of foregoing her pre-marriage training and employment to perform the role of homemaker and mother. The trial court's amended decree of dissolution divided the marital property approximately 57% to Robert and 43% to Shari, representing a difference of over $23,000. Among the contentions Shari raises on appeal is the allegation that the trial court abused its discretion in its division of the marital property. Although some may consider our decision of this issue a departure from prior law, we have determined that, under the law of this state and the legislative policy expressed therein, the trial court indeed abused its discretion, under the facts of this case, in its division of the parties' marital property. See our discussion of Issue II, *infra*.

Shari raises five other issues for our consideration on appeal; however, we find it necessary to address but two of those issues. We have restated the three issues we decide today as follows:

I. Whether the trial court failed to divide all of the marital property between the parties?

II. Whether the trial court abused its discretion in its division of the parties' marital property?

III. Whether the trial court abused its discretion in ordering Robert to pay less than half of Shari's attorney's fees?

We find no error on the first issue, but reverse and remand for a new trial on the issues of property division and attorney fees.

## FACTS

Shari and Robert were married in 1963. At that time, Robert held a degree in pharmacy and was employed as a sales representative for Eli Lilly and Company. Shari had completed one year of nurse's training and a year and a half of training as a medical laboratory assistant. She had been employed as a medical technician prior to the marriage but discontinued her employment upon marrying Robert and engaged herself solely as homemaker and mother. Shari and Robert had three children, who were age seventeen, thirteen and seven at the time this action for dissolution was filed. By then, Robert had advanced to the executive position of Director of International Sales for Lilly. His gross annual income was in excess of $95,000, which included a yearly compensation bonus and performance award. The bonus and award were based on the performance of Robert and the company during a given year but were not calculated and paid to Robert until early the following year.[1] At the time she filed her petition for dissolution, Shari had been out of the work force for nineteen years. During the course of the divorce proceeding, in June, 1982, Shari enrolled in a two-year training program to become a respiratory therapist. Shari stated that, upon completion of her training in June, 1984, she could expect to find a job at a starting salary of approximately $12,000 per year. She also stated that, until she completed her training, she had no employment prospects.

Shari filed her petition for dissolution of marriage on January 6, 1982, and Robert counter-petitioned on January 18. The trial court entered a provisional order on February 26, 1982, which, among other things, ordered Robert to pay Shari's attorney $500 as preliminary suit money. The final hearing was held on eight dates between July 29 to September 27, 1982. On November 9, the trial court entered its judgment and decree of dissolution, which granted Shari's petition for divorce, awarded her custody of the children, ordered Robert to pay $85 per child per week in child support and all reasonable medical expenses of the children, divided the marital property, and ordered Robert to pay $4,500 to Shari's attorney, finding that $11,145 was a reasonable fee for his services.

On January 10, 1983, Shari filed a motion to correct errors. The trial court, in response, modified its original decree by deleting a paragraph, the terms of which are not relevant to this appeal, and entering an amended decree that was otherwise identical to the original decree. Shari now brings this appeal.

## I.

▬▬ Shari alleges the trial court erred in failing to divide all of the marital property between her and Robert. Specifically, Shari claims the trial court failed to include in the "marital pot" the payments Robert received from Lilly as his compensation bonus and performance award for 1981, paid to him in February, 1982.[2] We ob-

---

1. For example, the gross amount of the bonus and award payments for 1981 was about $20,000, which was calculated and paid to Robert, less tax withholding, in February, 1982.

2. Shari also claims that the trial court erroneously failed to divide between the parties the interest that was earned, between the final separation date and the date of the final decree, on funds on deposit in investment and savings accounts held in Robert's name, and that the court failed to divide between the parties certain items of personal property the court set over to the parties' children "to be used for their benefit

by the custodial parent." (Amended Decree, ¶ 8, R. 216.) Shari's Appellant's Brief fails to support these claims with any reasons or citations to case law, statutes or other authority. We therefore deem these allegations of error waived. Ind.Rules of Procedure, Appellate Rule 8.3(A)(7); O'Neal v. Deveny (1963), 135 Ind.App. 446, 194 N.E.2d 413; Board of Commissioners v. Nevitt (1983), Ind.App., 448 N.E.2d 333.

For the purpose of instructing the trial court on remand, however, on the question of the interest earned between the final separation date and the date of the final decree, we note that our supreme court has held that the trial

serve, at the outset, that the trial court was neither required nor requested to make special findings of fact, *see* Ind.Rules of Procedure, Trial Rule 52(A), and the court submitted no such findings on its own motion. Therefore, any theory supported by the evidence may be considered by this court in affirming the judgment of the trial court on this issue. *Sadler v. Sadler* (1981), Ind.App., 428 N.E.2d 1305.

Shari's petition for dissolution of marriage was filed on January 6, 1982, which therefore constitutes the date of "final separation" of the parties. *See* IND.CODE 31-1-11.5-11(a) (1982). Subsection 11(b) of the divorce statute orders the trial court to divide the property of the parties, including property "acquired by either spouse in his or her own right after the marriage and prior to final separation of the parties." *Id.* § 11(b). Shari's Exhibit 53, dated February 12, 1982, is Lilly's calculation of Robert's "Performance Award for 1981," (R. 389). The exhibit states that Robert's award, paid in the form of shares of Lilly stock, was earned for the year 1981 and that a gross amount of $9,562.84 would be added to his earnings statement and included on his W-2 statement. The exhibit also shows a 20% federal income tax withholding, for a net value of the performance award shares of stock delivered to Robert of $7,638.61. Shari's Exhibit 54 (R. 390) includes a pay stub for Robert's compensation bonus. It shows that Robert was paid a gross amount of $10,768 ($7,634.51 net after withholding) on February 11, 1982 for the pay period ending December 31, 1981. Also included in the exhibit is a letter from Lilly's chairman of the board indicating the compensation bonus was a consequence of

"the company's favorable results for 1981." (R. 390) Finally, page four of Robert's Exhibit B (R. 845) indicates that the net value of the performance award and compensation bonus after *all* 1982 taxes are considered—i.e. taxes beyond those withheld when the award and bonus were paid—was $10,367.

■ Together, Shari's Exhibits 53 and 54 and page four of Robert's Exhibit B indicate that Robert received a gross amount of $20,330.84 (net value after all taxes of $10,367) as his performance award and compensation bonus in February, 1982, and that these payments were earned by Robert in the year ending December 31, 1981. Robert argues that because these payments were not *actually acquired* by him until after the January 6 final separation date, they were not marital property subject to division by the trial court. *See* IC 31-1-11.5-11(b). Shari argues Robert had *acquired rights* to the payments by December 31, 1981—six days before the final separation of the parties—and, therefore, the payments were marital property the trial court was required to divide. *See In re Marriage of Osborne* (1977), 174 Ind. App. 599, 369 N.E.2d 653 (husband's interest in intestate estate of his mother, who died four months before final separation date but whose estate was still under probate at time of final hearing on dissolution petition, held sufficiently acquired to be considered marital property). Shari argues further that, because the trial court's decree of dissolution fails to mention specifically the distribution of these payments, and because they were made in Robert's name alone, the effect of the decree is that

---

court need not use any particular date for valuation of marital assets, but that the choice of valuation date is within the trial court's discretion to the end that a just and reasonable division of marital property be accomplished. *Taylor v. Taylor* (1982), Ind., 436 N.E.2d 56. We also note that our divorce statute, IC 31-1-11.5-11(b), includes, in the description of property the trial court is to divide in a dissolution action, property acquired by the parties' joint efforts. If, as we hold today, the funds on deposit earning interest were acquired by the joint efforts of the wage-earner and the homemaker

prior to their final separation, then the interest generated by those funds after the final separation could also be considered a product of the parties' joint efforts, even if the account holding the funds is controlled by only one party. Thus, we believe the trial court would be within its discretion in valuing income-generating assets, such as bank accounts, as of the date of the final decree, if such action is necessary to achieve a just and reasonable division of the marital property. *Taylor v. Taylor, supra;* IC 31-1-11.5-11(b).

the performance award and compensation bonus remain Robert's sole property.

We are inclined to agree that the value of the bonus and award was subject to division as marital property, because it appears Robert's right to it was not contingent upon his survival or continued employment with Lilly until the time of actual calculation and payment. Thus, Robert had a present vested interest in the bonus and award as of December 31, 1981, six days before the final separation date. *See Loeb v. Loeb* (1973), 261 Ind. 193, 301 N.E.2d 349; *Hiscox v. Hiscox* (1979), 179 Ind.App. 378, 385 N.E.2d 1166; *In re Marriage of Osborne, supra.*

■ We need not decide the question, however, because despite Shari's argument to the contrary, we believe the trial court in fact did divide the bonus and award between the parties. In Paragraph 19 of the amended decree (R. 220), the trial court ordered Robert to pay Shari $10,000 cash in two installments. The trial court divided all the other marital property in kind, and the provisions of Paragraph 19 may be fairly construed as an award to Shari of some part of the value of the performance award and compensation bonus. This theory is supported by evidence at trial that the value of Robert's bonus and award was, at a minimum, something more than $10,000. Thus, we conclude that Shari has failed to demonstrate error on this issue.[3] *See Sadler v. Sadler, supra.*

## II.

Shari next contends the trial court failed to divide the parties' marital property in a "just and reasonable manner," as required by IND.CODE 31–1–11.5–11(b) (1982), which states:

"(b) In an action pursuant to section 3(a) of this chapter, the court shall divide the property of the parties, whether owned by either spouse prior to the marriage, acquired by either spouse in his or her own right after the marriage and prior to final separation of the parties, or acquired by their joint efforts, in a just and reasonable manner, either by division of the property in kind, or by setting the same or parts thereof over to one (1) of the spouses and requiring either to pay such sum, either in gross or in installments, as may be just and proper, or by ordering the sale of the same under such conditions as the court may prescribe and dividing the proceeds of such sale. In determining what is just and reasonable the court shall consider the following factors:

(1) The contribution of each spouse to the acquisition of the property, including the contribution of a spouse as homemaker.

(2) The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift.

(3) The economic circumstances of the spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell therein for such periods as the court may deem just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties."

---

**3.** As noted, the trial court was neither required nor requested to make special findings of fact in this case, and he did not do so on his own initiative. *See* T.R. 52(A). Had such findings been made, this issue might not have been present, or at least would have been more easily decided, because the trial court's findings of fact presumably would have included a finding regarding whether Robert's performance award and compensation bonus were or were not a part of the "marital pot." Such findings also would have relieved us of the difficult task of deciphering the percentages of the net marital estate each party was awarded. *See infra,* n. 7. We strongly recommend that such findings be made in divorce cases such as this, where there is considerable marital property to be divided and some dispute over the value of some or all of the property.

When reviewing a challenge to the reasonableness of the trial court's division of marital property, this court presumes the trial court properly considered the statutory factors enumerated above. *In re Marriage of Patus* (1978), 175 Ind. App. 459, 372 N.E.2d 493. The party challenging the trial court's property division bears the burden of overcoming this presumption. *Temple v. Temple* (1982), Ind. App., 435 N.E.2d 259. Furthermore, our standard of review requires that we not reweigh the evidence and that we consider only the evidence most favorable to the appellee along with the reasonable inferences therefrom. *Swinney v. Swinney* (1981), Ind.App., 419 N.E.2d 996. The trial court's decision on this issue is subject to reversal only for abuse of discretion, *i.e.*, where the result reached by the trial court is clearly against the logic and effect of the facts and circumstances before the court, including any reasonable inferences that might be drawn therefrom. *Id.*

The abuse of discretion standard of review, particularly on the issue of the reasonableness of the trial court's division of marital property, has been justly criticized. In *Lord v. Lord* (1982), Ind.App., 443 N.E.2d 847, this court said of the abuse of discretion standard of review for a division of marital property issue:

> "We recognize that this standard is imprecise. The exercise of discretion should be governed by standards and procedures aimed at securing a more meaningful appellate review. Guidance should be given to the trial judge by not only specifying the factors which are important, but the range of choice within which the trial judge may properly act. The General Assembly has provided some direction by Ind.Code 31–1–11–5–

11; however, the range of choice remains limitless. As an example of a limited range of choice, our prior 'fault' divorce statute authorized alimony 'as the circumstances of the case shall render just and proper.' Burns-Anno.Stat. 3–1217.... 'Just and proper' meant that the award of alimony to an innocent and injured wife should be a sum as would leave her in as good a condition as she would have been if her husband had died and she remained a surviving widow or that the wife must have been left as well in non-cohabitation as in cohabitation. *Bahre v. Bahre*, [(1962) 133 Ind.App. 567, 181 N.E.2d 639.] Thus, the trial judge knew the limits of his discretion and had a range of choice within which he could properly act. No such direction has been given under the current Dissolution Act. Hence, our review of the exercise of discretion in most of these cases is meaningless. Absent an error of law, we merely pronounce in conclusory terms whether there was an abuse of discretion in the particular circumstances."

*Lord*, 443 N.E.2d at 850–51, n. 4.[4]

We do not deny the trial court's absolute discretion, in division of property cases, to determine factual matters such as how much income each party had, when and how certain property was acquired, or the value of the marital property. But in cases where one spouse is the primary breadwinner whose income—whether $100,000 or $20,000 or less—finances the acquisition of marital assets and the other spouse is the primary homemaker who earns no income, the simple question before the trial court is how to divide the marital property. In this opinion, we suggest that, *all other factors in subsection 11(b) being equal*, factor

---

**4.** To this we might add that the abuse of discretion standard seems especially ineffectual in a division of property case such as the present one, where the evidence presented on the five factors in subsection 11(b) was not in serious dispute, and, thus, did not rely on the credibility of the witnesses. The breadth of the trial court's discretion should be more limited and appellate scrutiny more intense in such cases than, for example, cases of child custody, *see* IC

31–1–11.5–21; *In re Marriage of Salas* (1983), Ind.App., 447 N.E.2d 1176 (child custody determination subject to abuse of discretion review). In child custody cases, the trial court's ability to observe the witnesses' demeanor, especially that of the parents and child, places the trial court in a position far superior to this court in determining the best interests of the child. *See* IC 31–1–11.5–21(a).

11(b)(1) requires a 50–50 division of the property between the breadwinner and the homemaker, absent a determination by the court that one spouse has seriously neglected his or her role.[5] This is perhaps a change in the law of this state because in the past, on identical facts, one court might have divided marital property 60–40 and another court 40–60, and our standard of review would have left us little choice but

to conclude that each division was within the trial court's discretion. This situation needs repair, and we believe today's decision will contribute to that end.[6]

■ The evidence most favorable to the decree supports the conclusion that, of a net marital estate of about $167,000, the trial court distributed approximately 57% to Robert and 43% to Shari.[7] Regarding the

5. In the case of a home affluent enough to hire labor to perform some traditional homemaking functions such as housecleaning, cooking, etc., we do not anticipate that a court could consider the spouse who manages the home "neglectful" simply because he did not perform each and every homemaking function himself.

6. Although we need not decide the question today, we also believe the presumption of an equal division of marital assets would apply as well in a case where the spouses' contributions during the marriage were less clearly defined than in the present case, i.e., where one or both spouses have performed both wage-earning and homemaking functions. In such a case, as here, it would appear that each party has accepted the role assumed by the other spouse and, therefore, that each has accepted the contribution of the other as equal to his own. *Cf. Temple v. Temple* (1982), Ind.App., 435 N.E.2d 259 (recognizing that both functions—homemaking as well as wage earning—have a marital value that contributes to the acquisition of marital property).

7. Because the parties stipulated the value of certain marital assets but presented conflicting evidence on the value of other assets, and because the trial court was neither required nor requested to make special findings of fact regarding the value of the marital assets divided by the decree, *see* T.R. 52(A), these percentages were somewhat difficult to calculate. We arrived at the 57%–43% split in the following way: When a party challenges the reasonableness of a division of marital property, our standard of review requires us to consider only the evidence most favorable to the appellee—in this case, Robert—and the reasonable inferences from such evidence. *Swinney v. Swinney* (1981), Ind. App., 419 N.E.2d 996. The evidence most favorable to Robert of the value of the assets for which conflicting evidence of value was present-

ed would be that which reduced to a minimum the difference between the value of the assets set over to Robert and those set over to Shari. This effect is achieved by valuating the assets set over to Shari at the highest value supported by the conflicting evidence and the assets set over to Robert at the lowest value. For those assets ordered divided equally between the parties, *see* Amended Decree, ¶¶ 17, 18 (R. 220), we have used the value supported by the appellee's evidence. We include in the value of the assets described as "Household Furnishings" set over to Shari the value of the property set over to the "parties' minor children to be used for their benefit by the custodial parent," Amended Decree, ¶ 8, (R. 216), because Shari was the custodial parent, *see* Amended Decree, ¶ 2, (R. 214). In addition, consistent with our holding in Part I of this opinion and the requirement that we consider the evidence most favorable to Robert, we have valued Robert's performance award and compensation bonus at $10,367, as evidenced by page four of Robert's Exhibit B, and we have allocated $10,000 to Shari and the balance to Robert. Also, in Paragraph 20 of the Amended Decree (R. 220) the trial court found that Shari owed $2300 to Robert from two loans he made to her and that Robert "should be given credit for said sum and [Shari] charged with said sum in the division of marital assets by the Court." (R. 220) We have accomplished this by adding $2300 to the value of the marital assets set over to Shari and deducting the same amount from the value set over to Robert, since the net effect on the total value of the marital estate resulting from the satisfaction of this debt is zero. Finally, the marital liabilities, all of which were charged to Robert, *see* Amended Decree, ¶ 13, (R. 219), have been valued at the levels established by Robert's evidence. Accordingly, a summary of the trial court's division of property appears as follows:

| ASSET | VALUE TO ROBERT | VALUE TO SHARI |
|---|---|---|
| Marital Residence | $126,500 | ——— |
| 1978 Fiat | $2,600 | ——— |
| 1966 Thunderbird | $1,800 | ——— |
| Tent Camper | $350 | ——— |
| Tractor/Mower | $350 | ——— |
| Life Insurance Policies | $4,207 | ——— |
| Florida Property | ——— | $12,000 |

five statutory factors the trial court was required to consider in making a just and reasonable division of the marital property, *see* IC 31–1–11.5–11(b), neither party argues that they acquired a significant amount of property prior to the marriage or through inheritance or gift, *see id.* § 11(b)(2), and neither party contends the other party should have his or her share of the marital estate significantly reduced because of conduct related to the disposition or dissipation of marital property, *see id.* § 11(b)(4). Thus, these factors do not figure into this appeal. It remains for us to examine the evidence most favorable to Robert relevant to paragraphs (1), (3) and (5) under subsection 11(b) of the divorce statute and to determine whether the trial court's division of the marital property constituted an abuse of discretion. *Swinney v. Swinney, supra.*

The evidence relevant to paragraph 11(b)(3) [8] clearly indicated that Robert's economic circumstances at the time the disposition of the marital property was to become effective were, relative to Shari's, very good. It was undisputed that Robert held a secure, high-paying executive position in a stable and profitable pharmaceutical firm, a position that included a variety of valuable fringe benefits. On the other hand, Shari had been out of the employment pool for the nineteen years of marriage, during which she served as homemaker and relied on Robert for support. It is not argued that either party's economic circumstances were enhanced by the expectancy of an inheritance or other econom-

| ASSET | VALUE TO ROBERT | VALUE TO SHARI |
|---|---|---|
| 1979 Chevrolet Van | —— | $9,000 |
| Household Furnishings | $3,854 | $10,049 |
| Performance Award, Compensation Bonus | $367 | $10,000 |
| A.F.N.B. Joint Savings Acct | $145 | $145 |
| A.F.N.B. Joint Checking Acct | 0 | 0 |
| Plainfield Joint Checking Account | 0 | 0 |
| Lilly Stock | $3,792 | $3,792 |
| Lilly Credit Union Account | $1,657 | $1,657 |
| Lilly Savings Plan | $9,105 | $9,105 |
| Merrill-Lynch Accounts | $13,682 | $13,682 |
| Loan From Robert to Shari | $2,300 | $2,300 |
| TOTALS | $166,109 | $71,730 |

**LIABILITIES CHARGED TO ROBERT**

| | |
|---|---|
| American Fletcher Mortgage Co. | ($56,838) |
| Lilly Credit Union | ($ 3,414) |
| Visa | ($ 1,734) |
| Master Card | ($ 793) |
| National Bank of Detroit [Danville?] | ($ 564) |
| J.C. Penny Co. | ($ 63) |
| Phillips Oil Co. | ($ 233) |
| A.F.N.B., Redi-Reserve | ($ 272) |
| G.M.A.C. | ($ 107) |
| Interest Expense as of Jan. 6, 1982 | ($ 3,766) |
| 1981 Federal Income Tax | ($ 3,105) |
| 1981 State Income Tax | ($ 183) |
| TOTAL LIABILITIES TO ROBERT | ($71,072) |

| | | |
|---|---|---|
| NET ASSETS SET OVER TO ROBERT | $ 166,109 − ($71,072) = | $95,037 |
| NET ASSETS SET OVER TO SHARI | | $71,730 |
| TOTAL NET MARITAL ASSETS | $ 95,037 + $71,730 = | $166,767 |
| % NET MARITAL ASSETS TO ROBERT | $ 95,037/$166,767 = | 56.99% |
| % NET MARITAL ASSETS TO SHARI | $ 71,730/$166,767 = | 43.01% |

**8.** For the sake of enhancing the clarity of our holding on this issue, we begin our discussion with an examination of the evidence relevant to paragraphs 11(b)(3) and (5), saving 11(b)(1) for last. The result we reach would be no different were we to start with paragraph 11(b)(1).

ic benefit other than salary. Once the trial court's disposition of marital property became effective, Robert's advantage in economic circumstances was even more clearcut, in light of the trial court's 57%–43% division of the marital assets in his favor. Although the amended decree of dissolution also required Robert to pay $255 per week ($13,260 per year) in child support, and this is a factor to consider in evaluating Robert's economic circumstances, it does not narrow the gap in the parties' economic circumstances to such a degree as to alter the result we ultimately reach on this issue.

Also relevant here is the mandate of paragraph 11(b)(3) that the trial court consider the desirability of awarding the marital residence or the right to live therein to the party receiving custody of the children. Although the divorce decree awarded custody of the parties' three minor children to Shari and possession of the marital residence to Robert, the evidence most favorable to Robert indicates that Shari believed that possession of the home would have been beyond her means because of maintenance expenses. Instead, Shari apparently wanted Robert to receive the house and pay her a cash award sufficient to allow her to buy or rent a smaller home or apartment. *See* IC 31–1–11.5–11(b) (trial court, in making a just and reasonable division of the marital property, may set part of that property over to one spouse and require him to pay the other spouse a just and proper sum). It appears, however, the trial court did not exercise this option and, instead, divided all the marital property in kind.[9]

The undisputed evidence relevant to paragraph 11(b)(5), regarding the earnings or earning abilities of the parties, also showed Robert's position clearly superior to Shari's. Robert earned a gross salary of over $95,000 in 1981, while Shari earned nothing. In addition, Robert's executive position with Eli Lilly and Company was secure, and he could expect similar earnings in the future. Even if he were to leave his job with Lilly, Robert's many years of experience as a businessman ensured his future earning abilities. Shari, on the other hand, was receiving training as a respiratory therapist at the time the marriage was dissolved. While she expected this training, upon its completion in June, 1984, to enable her to find a job at $12,000 per year, it appears Shari had no prospect of employment until that time, as her premarriage training of one year as a nurse and eighteen months as a medical laboratory assistant had become outdated.[10] Thus, Robert's earnings and earning abilities under paragraph 11(b)(5), like his economic circumstances under paragraph 11(b)(3), were far superior to Shari's.

Considered alone, the logic and effect of the facts and circumstances relevant to paragraphs 11(b)(3) and (5) would seem to indicate a division of marital property more favorable to Shari than the 57%–43% division in Robert's favor made by the trial court. However, in *Swinney v. Swinney, supra,* in discussing the five factors the trial court must consider in making a "just and reasonable" division of property under subsection 11(b), this court stated:

"The term 'just' invokes a concept of fairness and of not doing wrong to either party; however, 'just and reasonable' does not necessarily mean equal or relatively equal. *In re Marriage of Os-*

---

**9.** See part I of this opinion, construing the trial court's $10,000 cash award to Shari as a division of Robert's performance award and compensation bonus.

**10.** In his appellate brief, Robert states: "The testimony given in the trial was that [Shari] was previously a medical technician, could return to that profession, with a refresher course, and would have earnings comparable to that which she would receive at the end of a lengthly [sic] college course which she elected to take pending

the final disposition of the trial." Appellee's Brief at 8. Robert does not point out where, in the nearly 1,500 pages of trial transcript, this testimony was received, however, and we will not search for it. Nevertheless, even assuming the truth of this statement, it only means that, after a refresher course of unstated duration, Shari could have had a job paying her $12,000 per year. Robert's earning ability was still clearly superior to Shari's.

*borne,* (1977) [174] Ind.App. [599] 369 N.E.2d 653, 656. Because a substantial contribution by one spouse under one subparagraph may be offset by the contribution by the other spouse under another subparagraph, the trial court must look to the total circumstances when determining what is just and reasonable and have a rational basis for its action to avoid error. *Id.* at 657."

*Swinney v. Swinney,* 419 N.E.2d at 998. Thus, despite the apparent effect of the undisputed evidence relevant to paragraphs 11(b)(3) and (5), the division of property favorable to Robert made by the trial court may yet be supported as just and reasonable if the effect of that evidence is offset by the evidence of the relative contributions of the parties under paragraph 11(b)(1), to which we now turn our attention.

Paragraph 11(b)(1) requires the trial court, in determining what is a just and reasonable division of the marital property, to consider "[t]he contribution of each spouse to the acquisition of the property, including the contribution of a spouse as homemaker." IC 31–1–11.5–11(b)(1). In *In re Marriage of Patus, supra,* Judge Staton, of our third appellate district, stated:

"The 'homemaker contribution' was isolated by the legislature to allow for the circumstance wherein (1) one spouse is not employed outside the home, (2) that the unemployed spouse is *solely* a homemaker, and (3) that the unemployed, homemaking spouse is the *primary* homemaker. Webster defines homemaker as 'one who manages a household.' "

175 Ind.App. at 461, 372 N.E.2d at 495.

In *Temple v. Temple, supra,* Judge Shields, of our second appellate district, took a broader view of paragraph 11(b)(1), stating:

"[C]ontrary to *Patus,* we find the statutory mandate to consider the contribution of each spouse to the acquisition of the marital property, including the contribution of a homemaker, is a recognition by the legislature that the homemaking endeavors of both spouses in a marriage have a marital value which contributes to the acquisition of marital property. There is no justification for limiting this factor exclusively to a non-wage earner, primary homemaking spouse. Rather, both functions, homemaking and wage earning, are considerations."

435 N.E.2d at 262. While we are inclined to agree with the opinion expressed in *Temple,* because the view taken in *Patus* would seem to write paragraph 11(b)(1) out of the statute in the case where one spouse contributes both as wage earner and homemaker, we need not attempt to reconcile the conflict in the two opinions, inasmuch as paragraph 11(b)(1) applies to the present case under both *Patus* and *Temple.*

■■■ The undisputed evidence relevant to paragraph 11(b)(1) showed that throughout the parties' nineteen-year marriage, Shari functioned solely as homemaker while Robert's primary function was to earn money for the family. Thus, it is clear that Robert's *financial* contribution to the acquisition of the parties' marital property far outweighed Shari's *financial* contribution; indeed, she presented no evidence of such contribution, by way of showing the market value of the homemaking chores she performed or otherwise. *See infra,* n. 11. Were there any indication the legislature intended paragraph 11(b)(1) to be limited to the financial contribution of each spouse to the acquisition of the marital property, we might affirm the trial court's division of property in this case as within the range of his discretion, because the evidence of Robert's vast financial contribution and the absence of evidence of such contribution by Shari might offset the effect of the evidence relevant to paragraphs 11(b)(3) and (5), discussed above. *See Swinney v. Swinney, supra.* We do not believe, however, that the legislature intended paragraph 11(b)(1) to be limited to financial contributions; [11] rather, we be-

---

**11.** The courts of this state have never precisely stated the meaning of paragraph 11(b)(1), per-

haps because it is the least concrete of the five factors the trial court is required to consider

lieve it was intended as "a recognition by the legislature that the homemaking endeavors ... in a marriage have a marital value which contributes to the acquisition of marital property." *Temple v. Temple*, 435 N.E.2d at 262 (recognizing value of homemaking endeavors of both spouses, not necessarily those of a non-wage earning homemaker alone). The "marital value" approach to homemaker contributions recognizes marriage as a voluntary association of co-equals, with implied equal rights,

under subsection 11(b). While paragraphs (2) and (4) refer to generally identifiable and traceable property (property brought into the marriage or acquired by gift or inheritance and property dissipated or disposed of by the conduct of a spouse) and paragraphs (3) and (5) refer to economic matters usually subject to direct proof (economic circumstances and earning abilities), paragraph (1) refers only to the nebulous "contribution" of each spouse in acquiring property, including the homemaker's contribution. Paragraph 11(b)(1) is not precise regarding the kinds of homemaker contributions the trial court is to consider, neither limiting the court to consideration of financial contributions nor explicitly authorizing consideration of less tangible contributions the homemaker might make, such as giving comfort and support to the wage earner. Our courts of appeal, in considering the implications of paragraph 11(b)(1), have been given to making general statements, repeating the statutory mandate that the trial court shall consider the contribution of a spouse as homemaker, without giving any guidance as to the weight to be given to that inexact mandate. *See, e.g., Kaply v. Kaply* (1983), Ind.App., 453 N.E.2d 331 (trial court "entitled" to weigh various factors, including wife's primary responsibility for raising eleven children and maintaining role of homemaker); *McBride v. McBride* (1981), Ind.App., 427 N.E.2d 1148 (stating in conclusory terms that division of assets itself indicated that wife's contribution as homemaker was among factors favorable to her that the trial court considered).

In an effort to lend some precision to the meaning of "the contribution of a spouse as homemaker," IC 31–1–11.5–11(b)(1), at least one commentator has advanced a market value approach, in which the homemaker spouse presents evidence of the market price required to purchase labor to perform various household chores (meal preparation, housecleaning, laundry work, shopping, child care and miscellaneous activities) and the number of hours spent performing each of those chores over the lifetime of the marriage. *See Kiker, Divorce Litigation: Valuing the Spouses' Contributions to the Marriage*, December, 1980 TRIAL 48. We reject this approach for a number of reasons.

duties and contributions, in which the parties define, assign, and carry out their roles. We believe this to be the most realistic and logical view of the marriage relationship.

A necessary corollary to the legislature's recognition of the marital value of homemaking endeavors to the acquisition of marital property, *Temple v. Temple, supra,* is a rebuttable presumption that the contribution of the homemaker is equal to

First, the market value approach to the homemaker's contribution ignores the fact that socio-economic characteristics of the household may determine the amount of time a homemaker actually spends performing household chores. That is, in a family in which the wage earner has an income sufficient to actually hire out the performance of certain homemaking tasks, the market value of the homemaker's contribution —and, correspondingly, his share of the division of property—would be reduced even though the homemaker had no economic incentive to become a wage earner and was not expected to perform all the traditional homemaking chores.

Second, the market value approach ignores intangible yet psychologically beneficial contributions the homemaker brings to a marriage—for example, comfort and emotional support, the security of knowing the household is being overseen by a full-time manager, and freedom from housework—all of which contribute to the wage earner's ability to focus his full energy on career or employment.

Third, the market value approach to the homemaker's contribution reduces the marriage relationship to a purely economic arrangement in which the wage earner agrees to contribute his wages in exchange for the homemaker's contribution of the market value of his homemaking efforts. The reality of marriage—as anyone who has ever lived in that relationship knows—is far more complex.

Finally, the market value approach would needlessly complicate the dissolution of marriage proceeding by encouraging both parties to produce copious evidence of the time and value of the homemaker's efforts. This would involve not only the court time necessary for the presentation of such evidence, but also the expense to the litigants of hiring expert witnesses to testify to the market price of the various homemaking tasks. As the court said in *In re Marriage of Patus* (1978), 175 Ind.App. 459, 462, 372 N.E.2d 493, 496: "We decline to encourage trial courts ... to elicit volumes of self-serving testimony regarding homemaking contributions; the 'no-fault' system of divorce would be lost in the mire of who-did-what for the home."

the contribution of the wage earner. This presumption—and, we hold, the language of paragraph 11(b)(1)—means that a *potentially* equal, i.e. 50–50, division of the marital property should be the *starting point* for the trial court's analysis of the evidence relevant to paragraphs 11(b)(2) through (5). This presumption in no way contradicts the statement frequently found in the opinions of this court that the trial court need not divide the marital assets equally in order to achieve a just and reasonable division under subsection 11(b). *See, e.g., Kaply v. Kaply, supra; In re Marriage of Salas* (1983), Ind.App., 447 N.E.2d 1176. *We emphasize that the presumption is a rebuttable one,* with each party bearing the burden of proving that, in a particular case, an equal division of the marital property would not be just and reasonable. The trial court, of course, retains its broad, discretionary power to dispose of the marital property, *Henderson v. Henderson* (1980), Ind.App., 401 N.E.2d 73, and our review of the trial court's disposition continued to be circumscribed by the abuse of discretion standard. *Swinney v. Swinney, supra.*

There are several reasons why there must be a definite starting point for the trial court's analysis of the evidence relevant to subsection 11(b). First, it provides a necessary structure in which the trial court can more clearly appreciate and evaluate the evidence presented in rebuttal to the presumption of an equal division of marital property. Second, as noted previously, absent any articulated starting point, our standard of review of the trial court's exercise of its discretion has been rendered almost meaningless, and the trial court's range of choice has expanded to become almost limitless. *See Lord v. Lord, supra.* We believe the rebuttable presumption of equal division will promote more meaningful review, because, unlike in the past, we will know the point from which the trial court began its process of weighing the relevant statutory factors. Third, litigants will be aided in negotiating property settlement agreements because they will have a certain starting point from which to begin negotiations.

It is also clear that the only proper and reasonable starting point for the trial court's analysis of the relevant statutory factors must be an equal division of the marital property between the parties. Subsection 11(b) does not provide that any of the factors the trial court is required to consider should receive more or less weight than any of the other factors. Therefore, if the evidence on the relevant factors were in perfect equilibrium, it would be impossible to argue that any division of property other than an equal, 50–50 division would be just and reasonable; any other division would, instead, be arbitrary. Also, while the rebuttable presumption of equal division of marital property may be new to the law of this state, it is hardly a revolutionary concept. It appears the divorce law of a number of other jurisdictions recognizes such a presumption, either directly or indirectly.

"While the case law of other equitable distribution jurisdictions consistently emphasizes that an equitable—and not necessarily an equal—distribution is mandated, it would appear that in most jurisdictions equality is the starting point (in lieu of a historic or a legislative directive to the contrary). *See, e.g., Dietz v. Dietz,* 540 S.W.2d 418 (Texas Ct. of App., 1976) [overruled on other grounds, *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137 (Tex.S. Ct.) ] where the court stated:

'While an equal division is not required, there must be some reasonable basis for decreeing an unequal division of the property.'

and *Cherry v. Cherry* [ (1981) 66 Ohio St.2d 348, 421 N.E.2d 1293, 1298–99] where the court stated:

'In using the partnership analogy, this court in *Wolfe* did not intend to create a presumption, rebuttable or irrebuttable, that property be divided equally upon divorce; rather a potentially equal division should be the starting point of analysis for the trial.'

Moreover, while courts frequently do not explicitly require an equal distribution as the starting point, in reviewing a division of property, that is not equal, they tend to look for some justification for the unequal distribution. *See, e.g., Bailey v. Bailey,* 345 So.2d 304 (Alabama Ct. of App., 1977); *Hanson v. Hanson,* 252 N.W.2d 907 (S.Dakota S.Ct., 1977); *Almquist v. Almquist,* 214 Kan. 788 [522 P.2d 383] (Kan.S.Ct., 1974)."

*Paul W. v. Margaret W.* (1981), Pa.Ct.Common Pleas, 8 Family Law Reporter (BNA) 3013, 3015 (adopting rebuttable presumption of equal distribution of marital property). It also appears that, by express statutory directive, trial courts in Arkansas and North Carolina are required to divide marital property equally between the parties unless the court finds such division to be inequitable. *See* Freed, *Equitable Distribution as of December 1982,* 9 Family Law Reporter 4001, 4004–06 (quoting ARK. STAT.ANN. § 34–1214; N.C.GEN.STAT. § 50–20).

Finally, we believe that the language of paragraph 11(b)(1) supports the presumption of equal distribution. That paragraph requires the trial court, in dividing marital property, to consider "the contribution of each spouse to the acquisition of [marital assets], including the contribution of a spouse as homemaker." IC 31–1–11.5–11(b). Webster's Dictionary defines "contribute" as: "to give or supply in common with others." Thus, like the court in *Temple v. Temple, supra,* we believe the legislature intended paragraph 11(b)(1) as a recognition that the efforts of the homemaker have a marital value in common with the efforts of the wage earner. Moreover, we believe the legislature intended to recognize the reality of the marriage relationship as a common enterprise, a voluntary union of co-equals in which the parties define and agree upon their roles. There is no reason to believe the legislature intended to penalize the homemaker, who agrees to assume the role of household manager while his partner functions as wage earner, by limiting the sort of contribution relevant to paragraph 11(b)(1) to financial contribution. The legislature certainly could have chosen to limit this factor in that way but did not do so. We have noted the problems inherent in a financial or market value approach to the homemaker's contribution. *See supra,* n. 11. The presumption of equal distribution avoids these problems by recognizing as paramount the agreement of the parties to their role in the marriage, whatever the socioeconomic characteristics of the particular household. The presumption also accounts for the intangible yet beneficial contributions the homemaker makes to the marriage, and it eliminates the time and expense necessary for presentation of volumes of evidence, including expert testimony, of "who-did-what" for the marriage. In addition, the presumption of equal division implicit in paragraph 11(b)(1) serves to focus the litigation on the remaining factors in subsection 11(b) thus directing the trial court's attention to the more concrete considerations involving specific, identifiable property (paragraphs 11(b)(2) and (4)) and economic matters generally susceptible of direct proof (paragraphs 11(b)(3) and (5)).

We also note that the presumption of equal division is entirely consistent with our "no-fault" system of divorce. In 1973, the legislature expressly abolished the existing fault-based grounds for divorce,[12] *see* IC 31–1–11.5–1(b)(1), and established four no-fault grounds for dissolution proceedings, *see id.* § 3(a). *Flora v. Flora* (1975), 166 Ind.App. 620, 337 N.E.2d 846. Among the no-fault grounds is irretrievable breakdown of the marriage. IC 31–1–11.5–3(a)(1). While divorce on a petition alleging irretrievable breakdown is not to be granted routinely, by consent, or absent the trial

---

**12.** The fault-based grounds for divorce were adultery; impotency existing at the time of marriage; abandonment for two years; cruel and inhumane treatment; habitual drunkenness; the husband's failure to make reasonable provision for his family for two years; conviction of an infamous crime subsequent to the marriage; and incurable insanity for at least five years prior to the action for divorce. *Flora v. Flora* (1975), 166 Ind.App. 620, 624 n. 1, 337 N.E.2d 846, 849 n. 1 (citing IND.CODE § 31–1–12–3 (1971 ed.)).

court's finding that the marriage is actually broken beyond repair, *Flora v. Flora, supra,* the availability of divorce on this basis does leave the parties to a marriage relatively more free to seek termination of the relationship than under the fault-based system. In addition, our divorce law permits a spouse to seek legal separation from his partner, "which shall be decreed upon a finding by a court that conditions in or circumstances of the marriage render it currently intolerable for both parties to live together and that the marriage shall be maintained." IC 31–1–11.5–3(c). Thus, whatever the value of each party's contribution to the marriage might appear to have been to outsiders or in the market place, so long as it was accepted by the other—as evinced by the other's failure to seek termination of the relationship by divorce or legal separation—then each party must be presumed to have accepted the other's contribution as equal to his own. Thus, when one party seeks termination of the marriage and division of the marital property, the trial court should give effect to this presumption of equal contribution—implicit in the language of paragraph 11(b)(1) and the effect of our no-fault system of divorce—by using a potentially equal division of the property as the starting point for its analysis of the other statutory factors. *See The Guidelines for Property Division of the Domestic Relations Division of the Common Pleas Court of Cuyehoga County, Ohio* (Aid No. 15, Family Law Reporter (May, 1981)) *quoted in Paul W. v. Margaret W., supra,* 8 Family Law Reporter at 3015.

The effect of the rebuttable presumption of equal division of marital property in the present case is that we must hold the trial court abused its discretion in awarding Robert 57% of the marital assets and Shari 43%. We have noted that neither party argues factors 11(b)(2) and (4) have any effect on this case and that the undisputed evidence relevant to paragraphs 11(b)(3) (economic circumstances of the parties) and 11(b)(5) (the parties' earnings or earning abilities) showed Robert in a position far superior to Shari's. Thus, from the pre-sumption of equal distribution implicit in paragraph 11(b)(1), the only relevant evidence presented on the remaining factors in subsection 11(b) tended to rebut the presumption in Shari's favor. That is, while the evidence, even when viewed most favorably to Robert, showed that an equal division of property would not be equitable in this case, it also showed that the inequality of the division of property should be in Shari's favor because of Robert's superior economic circumstances and earning ability. It follows that the trial court's decision, awarding 57% of the marital property to Robert and 43% to Shari, was clearly against the logic and effect of the facts and circumstances before the court, and, therefore, constituted an abuse of discretion. *See Swinney v. Swinney, supra.* Thus, we must reverse the trial court on the issue of property division.

### III

Shari also alleges the trial abused its discretion in its award of attorney's fees, ordering Robert to pay less than half of those fees. In paragraph 24 of the amended decree of dissolution (R. 221), the trial court found that a reasonable fee for Shari's attorney was $11,145 and that Robert should pay $4500 directly to her attorney as his portion of those fees. In addition, the trial court's provisional order of February 26, 1982 ordered Robert to pay Shari's attorney $500 as preliminary suit money. (R. 45) We also note that in paragraph 25 of the amended decree, the trial court ordered Shari and Robert to pay their own expert witness' and appraisers' fees. (R. 221).

Indiana Code section 31–1–11.-5–16 states:

"The court from time to time may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for attorneys' fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceedings or af-

ter entry of judgment. The court may order the amount to be paid directly to the attorney, who may enforce the order in his name."

This statute grants a trial court broad discretion in assessing attorney's fees, *Hawblitzel v. Hawblitzel* (1983), Ind.App., 447 N.E.2d 1156, including the discretion to award an amount less than the full reasonable value of an attorney's services, *McBride v. McBride* (1981), Ind.App., 427 N.E.2d 1148. We will reverse the trial court's award of attorney's fees only when the award is clearly against the logic and effect of the facts and circumstances before the court. *In re Marriage of Gray* (1981), Ind.App., 422 N.E.2d 696. In determining an award of attorney's fees in an action under our divorce statute, "the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such other factors as bear on the reasonableness of the award." *Barnett v. Barnett* (1983), Ind.App., 447 N.E.2d 1172, 1176.

Examining these factors, it is clear that Robert's economic condition, ability to engage in gainful employment, and ability to earn adequate income were all far superior to Shari's, as reflected in our discussion of the evidence in part II of this opinion. In addition, Shari's resources were limited to those she received in the trial court's division of the marital property. The extent of those resources was more limited than the extent of the resources Robert was assigned in the trial court's 57%–43% division of the marital assets in Robert's favor. Another factor bearing on the reasonableness of the trial court's award of attorney's fees was the trial court's order that each party pay his or her own expert witness' and appraiser's fees. The rather complex tax issues that Robert raised in this case obliged Shari to hire her own tax expert to assess the validity of the evidence Robert presented. Shari's expert, Robert Donovan, C.P.A., testified that his fees would be in excess of $1,100. On the other hand, Robert's business experience permitted him to dispense with the hiring of a tax expert and to present his own evidence on the tax issues raised. Thus, on top of Shari's inferior resources, economic condition, ability to engage in gainful employment, and ability to earn adequate income, she also incurred a cost of litigation—hiring a tax expert—that Robert did not incur. Based on these considerations, we believe the trial court's award of attorney's fees constituted an abuse of discretion, and we must reverse on this issue as well.

We have reviewed the other issues Shari has raised—concerning an alleged bias on the part of the trial judge, his alleged failure to rule on two petitions for contempt filed by Shari, and the admission of certain evidence related to tax issues raised by Robert—and find no prejudicial error has been demonstrated.[13] Therefore,

---

13. Regarding the alleged bias of the trial judge, we do not find the actions attributed to or taken by him to be such as to overcome the presumption that a trial judge is unbiased and unprejudiced in matters over which he presides. *See Leistikow v. Hoosier State Bank* (1979), 182 Ind. App. 150, 394 N.E.2d 225. In any event, Shari is entitled to a change of venue from the judge for the new trial, if she desires one. *See* Ind.Rules of Procedure, Trial Rule 76(5). On the issue of the trial court's alleged failure to rule on Shari's two petitions for contempt, we find to be moot the issue raised in her petition alleging Robert's violation of the trial court's provisional order restraining each party from bothering the other. The other petition—alleging Robert unilaterally withheld about $200 from a monthly temporary support payment required by the trial court's provisional order—raised an issue we believe to have been settled in the general division of property made by the trial court, and, thus, can be reviewed on remand. Concerning Shari's contention that the trial court erred in admitting into evidence two exhibits related to tax issues raised by Robert, we believe the exhibits were properly admitted because the trial court, in valuing the spouses' marital assets, may hear evidence concerning the nature of a given asset and the tax consequences that might result from a hypothetical distribution of such asset by the court. *See Burkhart v. Burkhart* (1976), 169 Ind.App. 588, 349 N.E.2d 707. This is not to say, of course, that the court is required to believe and apply such evidence. *See Burkhart, supra.*

we reverse and remand for a new trial on the issues of the division of marital property and the award of attorney's fees.

CONOVER and YOUNG, JJ., concur.

Finally, we wish to make clear our mandate regarding the new trial. First, the new trial is to be limited to the issues of the division of the marital property and the award of attorney's fees. The other legal effects of the amended decree—the dissolution of the marriage, award of child custody and order for child support—were not challenged in this appeal and, thus, are not open to relitigation. We also note that during the pendency of the proceedings in this case, Indiana Code section 31–1–11.5–11(d)(3) (Supp.1984) providing for rehabilitative maintenance, has become effective. We do not believe that this amendment to our divorce law may be retroactively applied in the new trial of this case, because the amendment creates a new right to the spouse seeking rehabilitative maintenance rather than merely providing a new remedy or procedure for enforcing an existing right to such maintenance. *Cf. Tremps v. Ascot Oils, Inc.* (7th Cir.1977), 561 F.2d 41; *Tarver v. Dix* (1981), Ind.App., 421 N.E.2d 693; *McGill v. Muddy Fork of Silver Creek Watershed Conservancy District* (1977), 175 Ind.App. 48, 370 N.E.2d 365; *Hine v. Wright* (1941), 110 Ind.App. 385, 36 N.E.2d 972 (en banc).